# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary M. Kuller,                         :
       Petitioner      :
             :
     v.                           :  No. 1657 C.D. 2019
             :  Submitted: June 19, 2020
Unemployment Compensation Board   :
of Review,                              :
       Respondent      :

BEFORE:  **HONORABLE RENÉE COHN JUBELIRER,** Judge
      **HONORABLE PATRICIA A. McCULLOUGH,** Judge
      **HONORABLE J. ANDREW CROMPTON,** Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**      **FILED: September 15, 2020**

  Mary M. Kuller (Claimant), pro se, petitions for review of an Order of the Unemployment Compensation (UC) Board of Review (Board) dated October 7, 2019, which affirmed a Referee's Decision finding Claimant ineligible to receive UC benefits pursuant to Section 402(e) of the UC Law (Law).[1] On appeal, Claimant challenges the Board's determination that Claimant did not demonstrate good cause for being nearly five hours late to work on April 14, 2019. Specifically, Claimant challenges the Board's decision not to credit her testimony regarding why she was

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (setting forth that a claimant is ineligible to receive UC benefits when that claimant's "unemployment is due to [] discharge or temporary suspension from work for willful misconduct connected with [the claimant's] work . . .").

late that day. Because we are bound by the credibility determinations of the Board, we are constrained to affirm.

## I. Factual Background and Procedure

Claimant worked as an emergency room technician for Nazareth Hospital (Employer) from April 2015 until she was discharged from that position on May 13, 2019. Thereafter, Claimant filed for UC benefits. UC authorities requested information from both Claimant and Employer regarding Claimant's discharge. Based upon this information, the Department of Labor and Industry's Office of UC Benefits issued a Notice of Determination finding Claimant ineligible to receive UC benefits pursuant to Section 402(e) for the Law because Claimant was discharged for willful misconduct. (Certified Record (C.R.) Item 6.) Specifically, the Office of UC Benefits found Claimant received a final warning from her Employer on October 3, 2018, that further lateness "within a rolling calendar" year would result in her discharge and that Claimant was discharged for being late to work on April 14, 2019. (*Id.*)

Claimant timely appealed the Notice of Determination.

### A. Proceedings before the Referee

Claimant's appeal was assigned to a Referee, who conducted a hearing on July 24, 2019. Claimant, who was represented at the hearing by a legal intern, and three witnesses for Employer testified at the hearing. Claimant testified, in relevant part, as follows. On Saturday April 13, 2019, she was in Pittsburgh at her son's boxing tournament. She left Pittsburgh the following morning at 5:00 a.m. as she was scheduled to work a 12-hour shift at 11:00 a.m. (C.R. Item 10, Hearing (Hr'g) Transcript (Tr.) at 19.) Claimant planned to drive from Pittsburgh to her home in

Upland to change before work, and then drive from her home to Nazareth Hospital. (*Id.* at 19-20.) She believed that by leaving at 5:00 a.m. she would have time to drive home, change for work, and make it to work in time for her 11:00 a.m. shift. (*Id.* at 19.) As support for her contention that leaving Pittsburgh at 5:00 a.m. should have allowed her to arrive on time for her 11:00 a.m. shift, Claimant presented two Google Maps routes, which were admitted into evidence without objection. The first map sets forth a 308-mile route from a non-specific address in Pittsburgh to Claimant's home in Upland, and reflects an estimated travel time of 4 hours and 47 minutes. (Hr'g Tr., Claimant's Ex. 1.) The second map sets forth a 31-mile route from Claimant's home to Nazareth Hospital, and reflects an estimated travel time of 45 minutes. (*Id.*, Claimant's Ex. 2.) Claimant testified that within an hour of leaving Pittsburgh, she "ran into bumper-to-bumper traffic." (Hr'g Tr. at 20.) At that point, Claimant called Employer at 6:00 a.m. and talked to the emergency room Unit Clerk. (*Id.* at 21.) Claimant told the Unit Clerk that she would be "between three and four hours" late for her shift. (*Id.*) The Unit Clerk responded by telling Claimant that she would pass that information on to the Charge Nurse. (*Id.*) Claimant received a text message from the Charge Nurse around 7:00 a.m., which stated "it [wa]s inappropriate" for Claimant "to be late" and that Claimant should report to her scheduled shift on time. (*Id.*) Claimant responded to the Charge Nurse by text message, stating that she was out of town, that she "didn't think [she] would be out of town this late," and that she would "get to work as soon as [she] c[ould]." (*Id.* at 22.) Claimant eventually reported for her shift around 4:00 p.m.

Claimant further testified that on April 15, 2019, the day after Claimant reported late for her shift, she sent the Charge Nurse a text message stating that the Charge Nurse's April 14, 2019 text message directing Claimant to report to work as

scheduled was inappropriate as it was sent "to bully and intimidate." (*Id.* at 23.) The following week, on April 23, 2019, Claimant had a meeting with the Charge Nurse to discuss the April 15, 2019 text message. According to Claimant, her lateness on April 14, 2019, was not addressed in that meeting. (*Id.*) After the meeting, Employer's Director of Nursing for Emergency Services asked Claimant to leave the hospital and informed her that she was suspended pending an investigation. (*Id.* at 23-24.) On May 9, 2019, Claimant met with Employer's Director of Human Resources and the Director of Nursing for Emergency Services. According to Claimant, the meeting concerned the April 15, 2019 text message that Claimant sent to the Charge Nurse and that her lateness on April 14, 2019, was not discussed. (*Id.* at 24.) Claimant testified that she was told at the meeting that she could return to work the following day but three hours after leaving the meeting the Director of Nursing for Emergency Services called and told her not to go into work the following day, and that she was also being investigated for lateness. (*Id.* at 24-25.) On May 13, 2019, Claimant received a call from Employer's Director of Nursing for Emergency Services who informed Claimant that she was being "terminated for lateness." (*Id.* at 25.)

During the hearing, Claimant was asked whether she had been tardy to work in the past. Claimant admitted that she has been tardy in the past and that she received a "final expectations counseling" for lateness in October 2018. (*Id.* at 26.) Claimant was asked whether she understood that the final expectations counseling was to be "a final warning and the next lateness would result in termination," and Claimant responded, "[y]es." (*Id.*)

Employer presented the testimony of the Director of Human Resources, the Charge Nurse, and the Director of Nursing for Emergency Services. The Director

4

of Human Resources testified, in relevant part, as follows. Employer has a four-step "progressive discipline [policy] for excessive lateness." (*Id.* at 6.) Employer's "Lateness and Early Departure" policy was admitted into evidence without objection. Also admitted was a signed copy by Claimant acknowledging receipt of the "Lateness and Early Departure" policy at the start of her employment with Employer. (Hr'g Tr., Employer's Ex. 2.) The "Lateness and Early Departure" policy sets forth the following "[s]tandards for [e]xcessive [l]ateness or [e]arly [d]eparture":

> 1. A colleague who has four (4) incidents of lateness/early departure within a rolling six (6) month period will receive [a]wareness [c]ounseling from his/her [m]anager.
>
> 2. A colleague who has received [a]wareness [c]ounseling for excessive lateness/early departure and has five (5) incidents of lateness/early departure within a rolling nine (9) month period will receive written [e]xpectations [c]ounseling from his/her [m]anager. . . .
>
> 3. A colleague who has received [e]xpectations [c]ounseling for excessive lateness/early departure and has six (6) incidents of lateness/early departure within a rolling twelve (12) month period will receive written [f]inal [e]xpectations [c]ounseling from his/her [m]anager. The [f]inal [e]xpectations [c]ounseling will state that the colleague is being placed on notice for the remainder of the rolling twelve (12) month period and that any incident of lateness/early departure during this notice period will result in a recommendation for permanent employment separation. . . .
>
> . . . .

(*Id.*, Employer's Ex. 1.) The Director of Human Resources testified that due to Claimant's past instances of lateness, Claimant received awareness counseling on August 5, 2017, expectations counseling on November 17, 2017, and final expectations counseling on October 3, 2018. (Hr'g Tr. at 7, Employer's Exs. 3-5.)

5

Claimant was tardy again on April 14, 2019. Specifically, Claimant was scheduled to work at 11:00 a.m. on April 14, 2019, and arrived at 3:48 p.m. (*Id.* at 9.) Thereafter, Claimant was suspended from work pending an investigation. The Director of Human Resources and the Director of Nursing for Emergency Services met with Claimant on May 9, 2019, to discuss the April 15, 2019 text message that Claimant sent to the Charge Nurse, as well as her lateness on April 14, 2019. (*Id.* at 10.) At that meeting, Claimant "declined to provide a reason for her lateness, other than the fact that she was out of town." (*Id.* at 18.) Contrary to Claimant's testimony, the Director of Human Resources stated that Claimant was not told at that meeting that she could return to work the following day. (*Id.*) On May 13, 2019, Claimant was discharged for lateness. Claimant's discharge letter was admitted into evidence without objection and states that Claimant received final expectations counseling for lateness on October 3, 2018. The discharge letter further states that since May 13, 2018, Claimant reported to work late on 13 occasions, including on April 14, 2019, and, as such, Employer is "ending the employment relationship effective May 13, 2019." (Hr'g Tr., Employer's Ex. 6.)

The Charge Nurse testified as follows. When she arrived at work on April 14, 2019, she was informed that Claimant had called and stated that she would be four to five fours late for her 11:00 a.m. shift. (*Id.* at 13.) She then sent Claimant a text message stating that it was not acceptable to be four to five hours late to her shift and requested Claimant call the emergency room so they could discuss the situation. (*Id.*) Claimant sent a reply text message stating that she was out of town, but Claimant did not call the emergency room as requested. (*Id.* at 11.) When Claimant reported to work on April 14, 2019, the emergency room was busy and, therefore, the Charge Nurse did not address Claimant's lateness at that time. (*Id.*) The

following day, Claimant sent the Charge Nurse a text message, which stated that the Charge Nurse's text message directing her to timely report to work "was unprofessional." (*Id.* at 12.) The Charge Nurse had a meeting with Claimant on April 23, 2019, at which Claimant became "emotional" and issued threats. (*Id.* at 11.) Claimant was asked to step out to calm down. The Charge Nurse eventually stepped away as well because she had to work.

Employer's Director of Nursing for Emergency Services testified as follows. On April 23, 2019, after Claimant's meeting with the Charge Nurse, the Director of Nursing for Emergency Services called Claimant into her office. (*Id.* at 13.) She told Claimant to clock out because she was sending her home pending an investigation. (*Id.* at 14.) The investigation initially focused on Claimant's "behavior" and then expanded when a review of Claimant's file revealed "that she had previous time and attendance issues." (*Id.* at 17.) Along with the Director of Human Services, the Director of Nursing for Emergency Services met with Claimant on May 9, 2019. At the meeting, Claimant was asked "if there were extenuating circumstances that she would like to share . . . as to why she was late" for her April 14, 2019 shift, but Claimant "declined" to provide anything further. (*Id.*) Thereafter, Claimant was discharged for lateness. During her testimony, the Director of Nursing for Emergency Services made clear that Claimant was not discharged due to her behavior as Claimant's "behavior was secondary to the lateness." (*Id.*)

After the hearing, the Referee issued a decision finding Claimant ineligible to receive UC benefits pursuant to Section 402(e) of the Law because Claimant was discharged for willful misconduct. The Referee found that Claimant had been warned in October 2018 that any additional lateness would result in her termination and that Employer established that Claimant reported to work late on April 14, 2019.

7

As such, the Referee concluded "Employer [] met its burden of proof in establishing that [] Claimant's discharge from employment was for reasons which rise to the level of willful misconduct" and that Claimant did not show good cause for her lateness. (Referee's Decision at 3.)

Claimant appealed the Referee's Decision to the Board.

B. Board's Opinion

In a decision dated October 7, 2019, the Board affirmed the Referee's Decision denying benefits pursuant to Section 402(e) of the Law. The Board made the following relevant findings of fact:

> 2. The [C]laimant knew that [E]mployer issued four-step progressive discipline for excessive tardiness: awareness counseling, expectations counseling, final expectations counseling, and discharge.
>
> 3. On August 5, 2017, the [E]mployer issued to the [C]laimant an awareness counseling for tardiness.
>
> 4. On November 17, 2017, the [E]mployer issued to the [C]laimant an expectations counseling for tardiness.
>
> 5. On October 3, 2018, the [E]mployer issued to the [C]laimant a final expectations counseling for tardiness.
>
> 6. On April 14, 2019, the [C]laimant was scheduled to work at 11:00 a.m.
>
> 7. At 6:00 a.m., the [C]laimant called the [E]mployer to advise that she would be three or four hours late.
>
> 8. At 7:15 a.m., the [E]mployer's [C]harge [N]urse arrived at work, learned of the [C]laimant's call, and sent a text message advising that tardiness was unacceptable and insisting the [C]laimant be on time for her shift.
>
> 9. The [C]laimant advised she was out of town and would be at work as soon as she could.

8

10. The [C]laimant arrived at work at 3:48 p.m.

11. The [C]harge [N]urse was too busy to talk to the [C]laimant when she arrived.

12. On April 15, 2019, the [C]laimant sent a text message to the [C]harge [N]urse complaining that the [C]harge [N]urse's prior communications were unprofessional.

13. On April 23, 2019, the [C]harge [N]urse . . . met with the [C]laimant to discuss her April 15, 2019, text message.

14. During this meeting, the [C]laimant became emotional, defensive, and abusive and yelled at the [C]harge [N]urse.

15. The [C]harge [N]urse felt threatened and asked the [C]laimant to step out of the room to calm so the conversation could continue.

16. The [C]laimant did not calm, so she was sent home and placed on paid administrative leave pending investigation of her behavior during the meeting.

17. During the investigation, the [C]harge [N]urse realized the [C]laimant had prior warnings for tardiness and expanded the scope of the investigation to include attendance.

18. On May 9, 2019, the [E]mployer's [D]irector of [H]uman [R]esources and the [E]mployer's [D]irector of [N]ursing for [E]mergency [S]ervices met with the [C]laimant to discuss her tardiness on April 14, 2019.

19. The [C]laimant advised she was out of town and unable to return to work, but declined to provide more details to establish extenuating circumstances.

20. On May 13, 2019, the [E]mployer advised the [C]laimant she was discharged for being late on April 14, 2019.

(Board's Opinion (Op.), Findings of Fact (FOF) ¶¶ 2-20.)

Based upon the foregoing findings of fact, the Board determined that Employer met its burden of demonstrating that Claimant's discharge was for willful

misconduct.  Specifically, the Board found that Claimant was discharged for her lateness on April 14, 2019.  The Board also determined that Claimant did not demonstrate good cause for her lateness.  This determination was based on the Board's decision not to credit Claimant's testimony regarding why she was late to her shift on April 14, 2019.  The Board explained:

> The [C]laimant's testimony strains credibility at several points.  The Board concludes it is unlikely the [C]laimant would encounter such traffic at 6:00 a.m. leaving Pittsburgh.  Even less credible is that the [C]laimant would know immediately that she would be delayed between three or four hours.  Finally, it is not credible that the [C]laimant encountered such severe and persistent traffic that it ultimately took her eleven hours to reach work – a trip that should have taken six hours.  The [C]laimant also declined to offer any mitigating circumstances to the [E]mployer when questioned on May 9, 2019.  Consequently, the Board discredits the [C]laimant's testimony and concludes she did not have good cause for her tardiness.

(*Id.* at 3.)  Accordingly, the Board concluded Claimant is ineligible to receive UC benefits pursuant to Section 402(e) of the Law.[2]

Claimant then filed the instant petition for review[3] with this Court.[4]

---

[2] Claimant sought reconsideration of the Board's Opinion, which was denied by the Board on November 6, 2019.

[3] Claimant filed an additional petition for review at docket number 1658 C.D. 2019.  That petition challenged a separate October 7, 2019 order of the Board denying Claimant's appeal from a referee's decision because Claimant was not aggrieved by the referee's decision.  The petition for review docketed at 1658 C.D. 2019 was quashed by Order of this Court dated March 13, 2020.

[4] "Our review is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Comp. Bd. of Review*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

10

## II. Discussion

On appeal, Claimant challenges the Board's determination that she did not demonstrate good cause for her lateness. Claimant admits that she was late for her April 14, 2019 shift, but argues that she had good cause. In her brief, Claimant provides the same reasoning for her lateness that she did before the Referee and Board. Claimant asserts that she left Pittsburgh at 5:00 a.m. to travel to work and on the way encountered bumper-to-bumper traffic, which caused her to report to work late. As to the Board's decision not to credit this testimony, Claimant argues "the law is not based off of opinions" but rather is "based off of facts and the [Board] declined my benefits based off [its] opinion that it was unlikely that I encountered such traffic, which [it] had no evidence to support." (Claimant's Brief (Br.) at 7.) Given that her lateness was out of her control and that she properly and timely reported she would be late to her shift, Claimant argues she demonstrated good cause for her lateness on April 14, 2019.

The Board responds that Claimant did not demonstrate good cause for her lateness and, therefore, the Board's Opinion should stand. Noting that Claimant's brief does not challenge the Board's findings regarding Claimant reporting to work late on April 14, 2019, nor the Board's finding that Claimant was discharged for that lateness, the Board contends those findings are conclusive on appeal. In its Opinion, the Board found that Claimant called into work on April 14, 2019, to report that she would be late for her 11:00 a.m. shift. As such, the Board asserts, the only issue for our review is whether the Claimant's lateness was justified. Since the Board did not credit Claimant's testimony as to why she was late on April 14, 2019, the Board contends Claimant "did not meet her burden to establish good cause for her tardiness rendering her termination from employment due to willful misconduct." (Board's

11

Br. at 14.) As to its decision not to credit Claimant's testimony, the Board asserts that it "acted well within its powers as ultimate factfinder to discredit Claimant's testimony." (*Id.*)

The crux of this case is whether Claimant met her burden of demonstrating good cause for her tardiness on April 14, 2019. Before analyzing the parties' arguments, we recount the law on willful misconduct. Section 402(e) of the Law sets forth that a claimant is ineligible to receive UC benefits when that claimant's "unemployment is due to [] discharge or temporary suspension from work for willful misconduct connected with [the claimant's] work." 43 P.S. § 802(e). "Whether or not an employee's actions amount to willful misconduct is a question of law subject to review by this Court." *Gordon Terminal Serv. Co. v. Unemployment Comp. Bd. of Review*, 211 A.3d 893, 898 (Pa. Cmwlth. 2019) (quoting *Nolan v. Unemployment Comp. Bd. of Review*, 425 A.2d 1203, 1205 (Pa. Cmwlth. 1981)). In UC cases, the employer bears the burden of demonstrating that the claimant's unemployment is due to willful misconduct. *Walsh v. Unemployment Comp. Bd. of Review*, 943 A.2d 363, 368 (Pa. Cmwlth. 2008). The Law does not define the term "willful misconduct"; however, our Supreme Court defined that term in *Caterpillar, Inc. v. Unemployment Compensation Board of Review*, 703 A.2d 452, 456 (Pa. 1997), as "a) wanton or willful disregard for an employer's interests; b) deliberate violation of an employer's rules; c) disregard for standards of behavior which an employer can rightfully expect of an employee; or d) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations." "In order to prove willful misconduct by showing a violation of employer rules or policies, the employer must prove the existence of the rule or policy and that it was violated." *Walsh*, 943 A.2d at 369. Once an employer meets its burden of demonstrating the

12

claimant violated a work rule, "the burden shifts to the claimant to show that [the work rule] is unreasonable or that good cause existed for the violation" of the rule. *Dillon v. Unemployment Comp. Bd. of Review*, 68 A.3d 1054, 1060 (Pa. Cmwlth. 2013). To establish good cause for lateness, a claimant must demonstrate that the lateness was justified and "properly reported according to the employer's rules." *See Welded Tube Co. of Am. v. Unemployment Comp. Bd. of Review*, 401 A.2d 1383, 1385 (Pa. Cmwlth. 1979).

In the present matter, the Board found that "[E]mployer issued a four-step progressive discipline" policy for lateness and that Claimant received awareness counseling, expectations counseling, and a final expectations counseling pursuant this policy. (Board's Op., FOF ¶¶ 2-5.) After receiving the final expectations counseling, Claimant risked discharge for an additional lateness. The Board further found that Claimant was discharged for lateness after reporting nearly five hours late to work on April 14, 2019. (*Id.* ¶¶ 10, 20.) Claimant does not challenge these findings of fact and, therefore, they are conclusive on appeal. *Munski v. Unemployment Comp. Bd. of Review*, 29 A.3d 133, 137 (Pa. Cmwlth. 2011). Based upon these unchallenged findings, Employer met its burden of demonstrating that Claimant was discharged for willful misconduct. *Walsh*, 943 A.2d at 369. As such, the burden shifted to Claimant to demonstrate good cause for her lateness on April 14, 2019. *Dillon*, 68 A.3d at 1060. The Board found that Claimant called Employer at 6:00 a.m. on April 14, 2019, "to advise that she would be three or four hours late." (Board's Op., FOF ¶ 7.) Since the Board found that Claimant reported to her Employer that she would be late for her shift, the only issue remaining is whether Claimant met her burden of demonstrating that her lateness was justified. *See Welded Tube Co. of Am*, 401 A.2d at 1385.

Claimant contends her testimony before the Referee established her lateness was out of her control and, therefore, justified. At the hearing before the Referee, Claimant explained that she ran into bumper-to-bumper traffic on her drive from Pittsburgh to work, which caused her to report late to work, and that she properly and timely reported to Employer that she would be late for her April 14, 2019 shift. Claimant argues that the traffic conditions "can be unpredictable" and were "conditions out of [her] control." (Claimant's Br at 7.) She takes issue with the Board's decision not to credit this testimony, arguing that the Board "declined [her] benefits" based on its "opinion that it was unlikely that [she] encountered such traffic" when it did not have evidence to support its decision. (*Id.*) Claimant essentially argues that the Board capriciously disregarded her uncontradicted testimony that traffic caused her lateness to work.

A capricious disregard of evidence

> occurs where the fact finder willfully and deliberately disregards competent and relevant evidence that one of ordinary intelligence could not possibly have avoided in reaching a result. More specifically, a capricious disregard of evidence occurs where the factfinder has refused to resolve conflicts in the evidence, has not made essential credibility determinations or has completely ignored overwhelming evidence without comment. It is the responsibility of the factfinder to resolve the conflicts in the testimony and explain why it has accepted, or rejected, each piece of relevant evidence.

*Bertram v. Unemployment Comp. Bd. of Review*, 206 A.3d 79, 83 (Pa. Cmwlth. 2019) (quotation marks and citations omitted). However, "[t]he express consideration and rejection of [] evidence, by its definition, is not capricious disregard." *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 816 (Pa. Cmwlth. 2005). When examining whether a fact finder capriciously disregarded evidence, we "may not reweigh the evidence or make credibility determinations."

14

*Wise v. Unemployment Comp. Bd. of Review*, 111 A.3d 1256, 1263 (Pa. Cmwlth. 2015).

Here, the Board examined Claimant's testimony and chose not to credit her testimony explaining why she was late to work. Specifically, the Board found:

> The [C]laimant's testimony strains credibility at several points. The Board concludes it is unlikely the [C]laimant would encounter such traffic at 6:00 a.m. leaving Pittsburgh. Even less credible is that the [C]laimant would know immediately that she would be delayed between three or four hours. Finally, it is not credible that the [C]laimant encountered such severe and persistent traffic that it ultimately took her eleven hours to reach work – a trip that should have taken six hours. The [C]laimant also declined to offer any mitigating circumstances to the [E]mployer when questioned on May 9, 2019. Consequently, the Board discredits the [C]laimant's testimony and concludes she did not have good cause for her tardiness.

(Board's Op. at 3.) Since "express consideration and rejection of [] evidence, by its definition, is not capricious disregard" of evidence, the Board's rejection of Claimant's testimony was not a capricious disregard of that evidence. *Taliaferro*, 873 A.2d at 816.

As to the Board's decision not to credit Claimant's testimony in part, we are bound by that decision. *Serrano v. Unemployment Comp. Bd. of Review*, 149 A.3d 435, 439 (Pa. Cmwlth. 2016). We understand Claimant's desire to see her son compete in a sporting event and sympathize with her belief that she left Pittsburgh with enough time to timely report for her shift. However, we are not permitted to disturb the Board's decision not to credit Claimant's testimony that she encountered heavy traffic on April 14, 2019, causing her to report to work almost five hours late, because the Board "is the ultimate fact finder in UC cases and has the sole discretion to determine the credibility of witnesses . . . and is free to accept or reject the testimony of any witness in whole or in part." *Narducci v. Unemployment Comp.*

15

*Bd. of Review*, 183 A.3d 488, 498 (Pa. Cmwlth. 2018). Even though Claimant's testimony explaining why she was late to work was uncontradicted, the Board is free to reject uncontradicted testimony. *Russo v. Unemployment Comp. Bd. of Review*, 13 A.3d 1000, 1003 (Pa. Cmwlth. 2010). Since the Board did not credit Claimant's testimony regarding why she was late to work on April 14, 2019, that testimony did not become fact as "[f]indings of fact are constructed of conclusions concerning the weight and creditability given the testimony and other evidence." *Claim of Wright*, 360 A.2d 842, 844-45 (Pa. Cmwlth. 1976). Given that the Board did not credit Claimant's testimony as to why she was late on April 14, 2019, we cannot conclude that the Board erred in determining that Claimant did not meet her burden of demonstrating good cause for her lateness.

### III. Conclusion

Accordingly, for the foregoing reasons, we conclude that Employer met its burden of demonstrating Claimant was discharged for willful misconduct. Specifically, Employer demonstrated that it has a progressive discipline policy for lateness, of which Claimant is aware, that Claimant received a final warning under the policy that further lateness would result in her termination, and that Claimant was discharged pursuant to the policy for her lateness on April 14, 2019. Since Claimant did not establish good cause for her lateness, she is ineligible for UC benefits pursuant to Section 402(e) of the Law.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary M. Kuller,                                      :
                 Petitioner                  :
                                 :

              v.                                  :    No. 1657 C.D. 2019
                                 :

Unemployment Compensation Board    :
of Review,                                           :
                 Respondent                :

# **O R D E R**


    **NOW**, September 15, 2020, the Order of the Unemployment Compensation Board of Review dated October 7, 2019, is hereby **AFFIRMED**.


                                 _____

                                 **RENÉE COHN JUBELIRER,** Judge